UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
HARVEY KATZENBERG, et al.,

              Plaintiffs,

    -against-

DERVAL LAZZARI, et al.,

              Defendants.
------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

04 CV 5100 (CBA)

      On November 24, 2004, plaintiffs Harvey Katzenberg and Pearl Katzenberg commenced

this action against Derval Lazzari ("Lazzari"), as Trustee of the Acme American Repairs, Inc.

Pension Trust (the "Trust" or the "Plan"), Acme American Repairs, Inc. ("Acme"), and the Trust

(collectively, "defendants"), alleging that defendants had violated various provisions of the

Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"), by

failing to pay benefits owed to plaintiffs under the Plan and by failing to provide certain

information to which plaintiffs claim they were entitled under the statute. In their Amended

Answer and Counterclaims, defendants asserted six counterclaims against Harvey Katzenberg,

alleging that he: (1) failed to properly fund the Acme Pension Plan and subsequently concealed

the underfunding; (2) embezzled funds from the Plan; (3) induced Lazzari to purchase stock in

Acme based on a fraudulent lease for property; (4) failed to disclose the existence of a

shareholders' agreement; (5) violated securities laws and committed common law fraud; and (6)

induced Lazzari to enter into a fraudulent consulting agreement.

      In or about August 2005, defendants offered to pay plaintiff Pearl Katzenberg certain

pension benefits in satisfaction of her claims in this suit. (See Defs.' Letter dated Dec. 19, 2005

at 1). By letter dated September 13, 2005, Ms. Katzenberg, through counsel, elected to be paid under Option B of the Plan, with a 50% Joint and Survivor Annuity, thus resolving her claims in this lawsuit.[1]

Thereafter, by Notice of Motion dated November 14, 2005, Mr. Katzenberg moved for summary judgment on the three causes of action detailed in the Complaint and on the defendants' first and second counterclaims. By Order dated December 8, 2005, the motion for summary judgment was referred to the undersigned.

While the motion for summary judgment was pending, defendants moved to amend their Amended Answer and Counterclaims,[2] seeking to withdraw certain counterclaims and to add additional allegations. Since the motion to amend raises a number of issues closely related to issues raised in the motion for summary judgment, this Court has addressed the motion to amend as well.

## FACTUAL BACKGROUND

In 1977, plaintiff Harvey Katzenberg began working for Acme, a corporation organized and existing under the laws of the State of New York, with its principal place of business at 99

---

[1]Ms. Katzenberg has filed an application for attorneys' fees incurred in connection with work performed on her behalf. That pending fee application will be addressed in a separate Report and Recommendation.

[2]Defendants have previously served both an initial Answer to plaintiff's Complaint and an Amended Answer and Counterclaims, neither of which appear to have been properly filed on the Court's Electronic Case Filing ("ECF") system. In their current motion to amend, defendants seek to amend their Amended Answer and Counterclaims.

Scott Avenue in Brooklyn, New York. (Pl.'s 56.1 Stmnt ¶¶ 2, 8; Katzenberg Decl. ¶¶ 5, 6).[3] The

company, which has been in operation for over 60 years, is engaged in the business of repairing

commercial food service and kitchen equipment. (Katzenberg Decl. ¶ 6). Over the course of the

twenty-four years that he worked for Acme, Harvey Katzenberg eventually served as Acme's

President and Chief Executive Officer. (Id. ¶ 7). From 1995 to March 2001, Mr. Katzenberg

was a fifty percent owner of Acme; Birinder Madan ("Madan") owned the remaining fifty

percent of the company. (Id.; Defs.' 56.1 Stmnt ¶ 2).[4] In January 2001, Mr. Katzenberg became

disabled and moved to Arizona. (Katzenberg Decl. ¶ 7). In March 2001, he sold his fifty percent

interest in Acme to Derval Lazzari. (Id.) Mr. Katzenberg is currently unemployed and collects

Social Security disability benefits. (Id.)

Through June 2001,[5] Mr. Katzenberg served as a trustee of Acme's Pension Plan. (Defs.'

56.1 Stmnt ¶ 1). Both Mr. Katzenberg and his wife, Pearl Katzenberg, who worked for Acme in

the area of contract administration until her retirement, are participants in the Plan and are also

beneficiaries under the Plan as spouses of Plan participants. (Compl. ¶¶ 13, 15-17). The Plan is

---

[3]Citations to "Pl.'s 56.1 Stmnt" refer to the Rule 56.1 Statement of Uncontested Material Facts submitted by plaintiff Harvey Katzenberg in support of his motion for summary judgment, which is dated November 14, 2005. Citations to "Katzenberg Decl." refer to the Declaration of Harvey Katzenberg, dated November 11, 2005.

[4]Citations to "Defs.' 56.1 Stmnt" refer to the Defendants' Rule 56.1 Statement of Contested Material Facts, dated December 22, 2005.

[5]The Court notes that in other submissions to the Court, defendants state the Mr. Katzenberg served as trustee of the Plan until March 2001. (See, e.g., Defs.' Amended Answer and Counterclaims ¶ 17). Mr. Katzenberg, while indicating that he served as trustee of the Plan for twenty years, does not specifically note the date on which he concluded his duties as trustee. (See Plaintiff's Declaration in Further Support of his Motion for Summary Judgment, dated June 14, 2006 ("Pl.'s Reply Decl."), ¶ 3).

a defined benefit plan that provides benefits upon a normal retirement age of 65. (Katzenberg Decl. ¶ 8). Plaintiff alleges that under the Plan, a Plan participant who terminates employment before reaching the age of 65 is "entitled to a distribution of benefits upon the occurrence of a one year break in service." (Id.) Plaintiff further alleges that although he has not yet attained the age of 65, he retired over four years ago and, despite his demands for payment of benefits, defendants have refused to pay in accordance with the Plan's provisions. (Id.; Compl. ¶ 22). Additionally, plaintiff contends that defendants have failed to supply him with certain documents relating to the Plan, including copies of the Plan and a summary Plan description. (Katzenberg Decl. ¶ 13; Compl. ¶¶ 26, 28).

Defendants, in responding to the Complaint, raise a number of defenses and assert a number of counterclaims against Mr. Katzenberg based on his alleged misconduct as trustee of the Plan. With respect to his claim for pension benefits, defendants contend that on or about December 6, 2001, Mr. Katzenberg informed Messrs. Madan and Lazzarri, as well as Thomas Gough, Acme's outside accountant, that he was relinquishing his rights to any benefits under the Plan. (Defs.' 56.1 Stmnt ¶ 4; Gough Aff. ¶ 20).[6] Mr. Katzenberg denies waiving any pension benefits, and contends that, in any event, vested pension benefits are not forfeitable. (Katzenberg Decl. ¶ 22).

Defendants contend that apart from the affirmative waiver of his rights, Mr. Katzenberg forfeited any claim to benefits because he committed malfeasance as trustee and acting Plan administrator, an issue that defendants raise in the context of both their affirmative defenses and

---

[6]Citations to "Gough Aff." refer to the Affidavit of Thomas Gough in Opposition to Plaintiff's Motion for Summary Judgment, dated December 16, 2005 and attached to defendants' Rule 56.1 Statement.

counterclaims. Specifically, defendant's accountant states that Mr. Katzenberg, who worked for a number of years as a public accountant (Gough Aff. ¶ 14), was "primarily responsible for the preparation and maintenance of Acme's books and records," and was the person who made "any decision of substance with respect to the Acme pension plan." (Id. ¶ 2). According to Mr. Gough, he reviewed the Plan records after the suit was filed and discovered a number of misappropriations by Mr. Katzenberg. (Id. ¶¶ 3, 4, 21). Specifically, defendants allege that Mr. Katzenberg withdrew certain funds from a pension account containing Plan assets and deposited those funds into an Acme checking account. (Id. ¶ 15). While it appears that some of the funds may have been reimbursed to the Plan account, other amounts are alleged to have been paid to Mr. Katzenberg and never repaid to the Plan account. (Id.)

In addition to these improper transfers, Mr. Gough discovered that certain forms used to report Plan assets were prepared by Mr. Katzenberg in a way that overstated the Plan's assets by over $107,000.00.[7] (Id. ¶ 4). By overstating the assets and, as a result, understating the amounts needed in contributions to the Plan, the Plan was deprived of funding needed to pay retirement benefits. (Id. ¶ 13). Defendants assert that "[b]y under-funding the Plan[,] Harvey Katzenberg benefitted by enabling Acme to retain moneys," which in turn benefitted Katzenberg who, at the time, was a fifty percent owner of Acme. (Id. ¶¶ 13, 14).

Plaintiff moves for summary judgment on the claims detailed in the Complaint, seeking payment of benefits owed, damages as a result of defendants' failure to provide Plan documents, and attorneys' fees and costs. Plaintiff also moves the Court to grant summary judgment in his

---

[7]Although defendants later isolated other overstatements, this figure refers only to the two overstatements identified at the time that defendants filed the Amended Answer and Counterclaims.

favor dismissing defendants' first and second counterclaims.

For the reasons set forth below, the Court respectfully recommends that plaintiff's motion for summary judgment as to his first, second, and third causes of action and as to defendants' second counterclaim be denied.[8] It is further respectfully recommended that defendants' motion for leave to amend their Amended Answer and Counterclaims be granted.

## DISCUSSION

## I. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Harvey Katzenberg moves for summary judgment on his claims that: (1) defendants failed to pay pension benefits to which he has become entitled, (2) defendants failed to provide Plan documents which, under ERISA, they were required to provide upon request, and (3) defendants owe him reasonable attorneys' fees and costs under 29 U.S.C. § 1132(g). In opposing plaintiff's claim for benefits, defendants have raised several arguments sounding in equity based on Mr. Katzenberg's alleged violations of his fiduciary duties as Plan administrator. Furthermore, defendants oppose plaintiff's claim for damages based on defendants' alleged failure to provide Plan documents, arguing that plaintiff had received these documents when he was acting Plan administrator and, in any event, that he has shown no injury from defendants' failure to supply the documents.

---

[8]Given the Court's recommended resolution of defendants' pending motion to amend, which seeks, among other things, to delete defendants' first counterclaim, the Court passes no judgment on plaintiff's motion for summary judgment with respect to that counterclaim. (See discussion infra at 41-48).

A. Standards for Summary Judgment

It is well-settled that a party moving for summary judgment has the burden of establishing that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990). Since summary judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury, see Egelston v. State Univ. Coll. at Geneseo, 535 F.2d 752, 754 (2d Cir. 1976); Gibralter v. City of New York, 612 F. Supp. 125, 133-34 (E.D.N.Y. 1985) (stating that summary judgment "is a drastic remedy and should be applied sparingly"), the Court should not grant summary judgment unless "it is quite clear what the truth is [and] that no genuine issue remains for trial." Auletta v. Tully, 576 F. Supp. 191, 195 (N.D.N.Y. 1983) (internal quotation marks and citations omitted), aff'd, 732 F.2d 142 (2d Cir. 1984). In addition, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999) (stating that "[w]hen considering a motion for summary judgment the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party").

Once the moving party discharges its burden of proof under Rule 56(c), the party opposing summary judgment "has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.'" Phillips v. Kidder, Peabody & Co., 782 F. Supp. 854, 858 (S.D.N.Y. 1991) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "provides that a party opposing a

properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48 (emphasis in original). Rather, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. Id. at 248 (internal citation omitted).

B. Plaintiff's First Cause of Action - Entitlement to Benefits Under ERISA

Plaintiff moves for summary judgment on his claim that he was wrongly denied pension benefits to which he was entitled under the Plan. Defendants, in response, contend that because plaintiff breached his fiduciary duties to the Plan, he should be estopped from receiving his benefits.

1) Standing

ERISA applies to "any employee benefit plan" that is "established or maintained . . . by any employer engaged in commerce or in any industry or activity affecting commerce." 29 U.S.C. § 1003(a)(1). ERISA defines "employee benefit plan" as "an employee welfare benefit plan [that provides health benefits or other enumerated benefits] or an employee pension benefit plan." 29 U.S.C. §§ 1002(1), (3). Neither party disputes the fact that the pension plan at issue in this case is covered by ERISA.

In order to enforce its provisions, ERISA permits a civil action to be brought:

> (1) by a participant or beneficiary --

8

> (A) for the relief provided for in subsection (c) of this section, or
>
> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan; . . .
>
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a). A "participant" includes a "former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer." 29 U.S.C. § 1002(7).

Plaintiff argues that he was a participant in Acme's Pension Plan as that term is defined in ERISA and was eligible to receive benefits under the Plan. In elucidating who may be a "participant" in an employee benefit plan, as defined by 29 U.S.C. § 1002(7), the Supreme Court has stated that "[i]n order to establish that he or she 'may become eligible' for benefits, a claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 117-18 (1989); see also Mullins v. Pfizer, Inc., 23 F.3d 663, 667 (2d Cir. 1994). According to the Court in Firestone, this definition "'attributes conventional meanings to the statutory language,'" and does not thwart Congressional intent to "ensur[e] that the 'individual participant knows exactly where he stands with respect to the plan.'" 489 U.S. at 118 (quoting Saladino v. I.L.G.W.U. Nat'l Ret. Fund, 754 F.2d 473, 476 (2d Cir. 1985) and H.R. Rep. No. 93-533, p.11 (1973)). The Second Circuit has adopted a view of standing under ERISA that is

predicated on "whether the plaintiff is 'within the zone of interests ERISA was intended to protect.'" Mullins v. Pfizer, Inc., 23 F.3d at 668 (quoting Vartanian v. Monsanto Co., 14 F.3d 697, 701 (1st Cir. 1994) (internal citations omitted)).

In light of the expansive view of standing under ERISA, plaintiff's initial showing of a colorable claim of entitlement under ERISA, and defendants' failure to object to plaintiff's assertions as to his status as a participant, this Court finds that plaintiff has standing to bring this action.

2) Standard of Review for Denial of Benefits Claim

In reviewing plaintiff's claim for unpaid pension benefits, the Court notes that the appropriate standard of review for a denial of benefits claim hinges upon the level of discretionary authority that the plan affords its administrator. If the plan documents do not confer upon an administrator the "authority to determine eligibility for benefits or to construe the terms of the plan," the denial of benefits is to be reviewed de novo. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. at 115; see also Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 249 (2d Cir. 1999). However, if the plan documents do confer such discretionary authority, the "arbitrary and capricious" standard applies, Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d at 249, and courts review the administrator's decision "with a strong measure of deference." Omara v. Local 32B-32J Health Fund, No. 97 CV 7538, 1999 WL 184114, at *2 (E.D.N.Y. Mar. 30, 1999). According to the Second Circuit, the plan administrator has the burden of establishing that the arbitrary and capricious standard applies, Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d at 249, and "'[i]n making this determination, any

10

ambiguities must be construed against the administrator and in favor of the party seeking judicial review.'" Almonte v. General Motors Corp., No. 95 CV 5173, 1997 WL 363815, at *3 (S.D.N.Y. June 30, 1997) (internal citation omitted).

In this case, neither party has addressed the standard under which defendants' denial of benefits should be reviewed. Although the Court would normally look to the Plan documents to determine whether the administrator had been given the authority to deny claims of otherwise eligible employees, see Kinstler v. First Reliance Standard Life Ins. Co., No. 96 CV 921, 1997 WL 401813, at *6 (S.D.N.Y. July 16, 1997) (noting that in the "'vast majority'" of cases where ERISA plans are found to grant discretionary authority, the plans contain "clear and explicit language regarding the scope of discretion"), aff'd, 181 F.3d 243, 251 (1999) (noting that "[w]hen we have deemed the arbitrary and capricious standard applicable, the policy language reserving discretion has been clear"), neither party in this instance seems to have provided the Court with the Plan documents necessary to make that determination.[9] Therefore, as defendants have failed to address the issue of whether there are any written plan documents that contain a provision regarding administrative discretion, plaintiff's denial of benefits claim should be reviewed de novo. Under this standard, all aspects of plaintiff's denial of benefits claim,

---

[9]Plaintiff has submitted two versions of "Adoption Agreement 002" (see Declaration of David B. Gelfarb, dated November 11, 2005 ("Gelfarb Decl."), Ex. E), one of which states that it is "an amendment" to the Plan, and the other of which states that it is a "restatement" of the Plan. (Id., Exs. E, M at 2). Both Adoption Agreements are signed by Lazzari. (Id., Ex. E). One of the two Adoption Agreements became effective on December 28, 2001 (id., Exs. M, E), after Mr. Katzenberg sold his interest in Acme to Lazzari. The other Adoption Agreement, which became effective on January 1, 2001, is "a restatement of a previously adopted plan" with an effective date of May 5, 1962 (the "1962 Plan"). (Id.) This 1962 Plan, which appears to govern Mr. Katzenberg's claim, has not been provided to the Court. The Court further notes that the parties have neglected to file many of the documents on the Electronic Case Filing ("ECF") system over the course of the litigation.

including fact questions and issues concerning the interpretation of plan terms, are reviewed <u>de novo</u>. See <u>Kinstler v. First Reliance Standard Life Ins. Co.</u>, 181 F.3d at 245, 249-51.

Moreover, in this case, the standard of review appears to be irrelevant. Defendants do not contest plaintiff's eligibility and entitlement to receive benefits under the terms of the Plan. (Tr. at 28-29). Rather, they argue that equity demands that plaintiff should be denied his benefits based on the breach of his fiduciary duties undertaken as trustee and administrator of the Plan. In the alternative, they argue that he voluntarily waived his right to receive benefits. Since these arguments are essentially affirmative defenses, and defendants do not challenge plaintiff's entitlement to benefits under the Plan's terms and definitions, this Court finds that plaintiff's entitlement to receive pension benefits under the Plan is not in dispute. The question, then, is whether the Court should order the full payment of benefits in light of the defendants' affirmative defenses. Plaintiff has also moved for summary judgment dismissing defendants' first and second counterclaims, which raise some of these issues.[10]

## C. Defenses to Plaintiff's Claim for Benefits

### 1) Breach of Fiduciary Duties

Turning first to defendants' claim that Mr. Katzenberg breached his fiduciary duties to the

---

[10]It should be noted that a number of the claimed breaches of fiduciary duty were not raised in defendants' Amended Answer and Counterclaims, and are therefore the subject of defendants' pending motion to amend, which seeks to formally add these allegations of malfeasance to their pleadings. (See discussion <u>infra</u> at 43-46). Moreover, defendants' first counterclaim – seeking an Order directing Mr. Katzenberg to reimburse Mr. Lazzari for contributions that Mr. Lazzari was allegedly required to make due to Mr. Katzenberg's underfunding of the Plan – is also a subject of the pending motion to amend, which seeks to delete this counterclaim. (See discussion <u>infra</u> at 46-47).

Plan, thereby relinquishing any equitable right to benefits, defendants point to certain conduct of Mr. Katzenberg undertaken while he was trustee and acting Plan administrator. Among other things, defendants assert that plaintiff breached his fiduciary duties when he furnished the Plan's actuaries with inaccurate reports of the Plan's assets for the years 1999 and 2000, resulting in the underfunding of the Plan. (Defs.' Mem. at 7-11).[11] Defendants also contend that plaintiff converted the Plan's funds by taking monies out of a Plan savings account and depositing those funds into an Acme account, marking them as a personal loan to Acme. (Id. at 12). Defendants assert that those monies were then paid to Katzenberg and that the Plan was never reimbursed for the amounts removed. (Id.)

a)  Standard for Breach of Fiduciary Duties

Under ERISA, an individual is considered a fiduciary to the extent that he or she "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of [the plan's] assets" or "has any discretionary authority or discretionary responsibility in the administration of such plan." Liss v. Smith, 991 F. Supp. 278, 302 (S.D.N.Y. 1998) (quoting 29 U.S.C. § 1002(21)(A)). The Second Circuit has noted that "Congress intended ERISA's definition of fiduciary 'to be broadly construed.'" LoPresti v. Terwilliger, 126 F.3d 34, 40 (2d Cir. 1997) (internal citation omitted).

In a recent decision, the Second Circuit held that Section 1002(21)(A) creates a bifurcated

---

[11]Citations to "Defs.' Mem." refer to the Defendants' Memorandum of Law in Opposition to [Plaintiff's] Motion for Summary Judgment, dated December 22, 2005.

test for determining whether someone is considered a fiduciary under ERISA. Bouboulis v. Transport Workers Union of Am., 442 F.3d 55, 63-65 (2d Cir. 2006). "'Subsection one imposes fiduciary status on those who exercise discretionary authority, regardless of whether such authority was ever granted. Subsection three describes those individuals who have actually been granted discretionary authority, regardless of whether such authority is ever exercised.'" Id. (internal citations omitted). Thus, the court held that even though the district court had determined that a labor union, which was listed as plan administrator in the summary plan description, performed "'purely ministerial functions,'" the union "possessed discretionary authority and responsibility in the administration of the Plan, and was thus a fiduciary by virtue of being a Plan Administrator." Id. at 63-34. This is consistent with Department of Labor regulations, which provide that "[s]ome offices or positions of an employee benefit plan by their very nature require persons who hold them to perform one or more of the functions described in section 3(21)(A) of the Act. . . .Persons who hold such positions will therefore be fiduciaries." 29 C.F.R. § 2509.75-8; see also Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein, 107 F.3d 139, 141-42 (2d Cir. 1997) (noting that "the administrator and trustees of a pension plan are fiduciaries within the meaning of the statute, for 'a plan administrator or a trustee of a plan must, b[y] the very nature of his position, have "discretionary authority or discretionary responsibility in the administration" of the plan'") (internal citations omitted); Chao v. James C. Docster, Inc., No. 01 CV 827, 2006 U.S. Dist. LEXIS 33216, at *19-27 (N.D.N.Y. Mar. 31, 2006) (discussing Bouboulis and holding that the company's CEO and named trustee of the retirement plan held fiduciary status).

Here, it is undisputed that Mr. Katzenberg acted as one of the Plan's trustees for the

14

period of time including the dates at issue in this case,[12] and he is therefore considered a fiduciary for ERISA purposes. Moreover, defendants assert that plaintiff conceded in his deposition in another action that he was acting as the Plan administrator during his tenure as Acme's President and CEO. (Defs.' Mem. at 2; Gough Aff. ¶ 2, Ex. A at 21).[13] If he was acting as Plan administrator, which plaintiff has not denied, that position would also merit plaintiff's status as a Plan fiduciary during that period. See Brovarski v. Local 1205, Int'l Bhd. of Teamsters Union, Pension Plan ("Brovarski"), No. 97 CV 489, 1998 WL 765141, at *5 (E.D.N.Y. Feb. 23, 1998) (internal citation omitted).

Plaintiff contends that the "preparation of the forms by Katzenberg was a ministerial duty," and that he "cannot be liable for breach of fiduciary duty because he was [ ] acting in a ministerial non-fiduciary capacity when he filled out the two forms."[14] (Pl.'s Mem. at 16).[15]

---

[12]Defendants note specifically that "[a]t all relevant times, until March 2001, when plaintiff Harvey Katzenberg purportedly retired from employment by defendant Acme American, he was trustee of the Plan." (Defs.' Amended Answer and Counterclaims ¶ 19). Plaintiff details that he was a Plan trustee for twenty years, specifically noting that he was trustee in September 2000, the period during which defendants allege that he improperly withdrew monies from the Acme Savings Account. (Pl.'s Reply Decl. ¶¶ 3, 12). Moreover, plaintiff does not contest that he was trustee on the other dates material to this lawsuit.

[13]Defendants cite to testimony given by Mr. Katzenberg during a deposition taken on August 10, 2004 in connection with the case of G.K. Alan Assoc., Inc. v. Lazzari, No. 13456/03, pending in Supreme Court, Nassau County. (Gough Aff., Ex. A).

[14]During oral arguments heard on July 25, 2006, plaintiff's counsel further indicated that filling out the forms was not done as part of Mr. Katzenberg's fiduciary capacity as trustee, as "[y]ou can be a fiduciary with respect to a plan but not be a fiduciary with respect to every single action you take with respect to the plan," and completing the forms did not require the exercise of any discretion. (See Tr. at 4-6).

[15]Citations to "Pl.'s Mem." refer to Plaintiff Harvey Katzenberg's Memorandum of Law in Support of Motion for Summary Judgment, dated November 14, 2005.

15

Although the court in <u>Denniston v. Taylor</u>, No. 98 CV 3579, 2004 WL 226147 (S.D.N.Y. Feb. 4, 2004), held that a plan administrator could not be liable for breach of fiduciary duty when performing ministerial tasks[16] (see <u>id.</u> at *9-11), that decision has been called into question by the Second Circuit's recent holding in <u>Bouboulis</u>. There, the court made it clear that certain individuals are fiduciaries even if they never exercise discretionary authority in a manner that would otherwise qualify for fiduciary status. See <u>Bouboulis v. Transport Workers Union of Am.</u>, 442 F.3d at 63-65; <u>see also</u> <u>Chao v. James C. Docster, Inc.</u>, 2006 U.S. Dist. LEXIS 33216, at *20 (noting that the <u>Bouboulis</u> court "rejected the claim that a labor union, who was listed as a plan administrator in member benefit plan documents, but asserted its responsibilities under the plan were 'limited to purely ministerial functions,' was not a fiduciary"). Thus, because plaintiff, as trustee and acting Plan administrator, possessed discretionary authority by the very nature of the positions that he occupied relative to the Plan, the allegation that completion of certain forms was merely ministerial[17] has no impact upon his status as fiduciary.

When a fiduciary breaches his or her fiduciary duty, ERISA provides that the fiduciary

---

[16]In <u>Denniston v. Taylor</u>, the court held that a plan administrator's approval and dissemination of plan communication materials containing erroneous benefit calculations did not state a viable claim of breach of fiduciary duty in part because the preparation of personal statements containing the benefit calculations was "ministerial, required no exercise of discretion, and therefore did not, standing alone, implicate fiduciary conduct." <u>Id.</u> at *11. After the Second Circuit's holding in <u>Bouboulis</u>, it appears that a plan administrator or trustee could be held liable even if he or she takes no discretionary action. 442 F.3d at 63-65.

[17]Since <u>Bouboulis</u> made it clear that one may be a fiduciary even in the absence of the exercise of discretionary authority, the Court need not determine whether the completion of these forms was merely a ministerial task. Nonetheless, although plaintiff argues that completion of the reports of Plan assets was a ministerial task that did not implicate his fiduciary duties, the Court notes that the reports prepared by Mr. Katzenberg were entitled "Fiduciary Data Report," suggesting that they were in fact prepared in his fiduciary capacity. (<u>See</u> discussion <u>supra</u> at 13-14).

"'shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary.'" Toussaint v. James, No. 01 CV 10048, 2003 WL 21738974, at *4 (S.D.N.Y. July 25, 2003) (quoting 29 U.S.C. § 1109(a)). "The 'appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust.'" Id. (quoting Dardaganis v. Grace Capital Inc., 889 F.2d 1237, 1243 (2d Cir. 1989) (internal citation omitted)); see also Brovarski, 1998 WL 765141, at *7.

ERISA also provides that a fiduciary who breaches his duty to the plan may be subject to equitable relief, including an Order requiring restitution of any funds misappropriated from a pension plan. See Herman v. Solidarity of Labor Orgs. Health & Welfare Fund, No. 95 CV 7247, 1999 U.S. Dist. LEXIS 8780, at *10 (S.D.N.Y. June 9, 1999) (internal citation omitted); Whitfield v. Tomasso, 682 F. Supp. 1287, 1305 (E.D.N.Y. 1988) (requiring defendants to "make the Fund whole for all monetary losses, and to disgorge all sums and other consideration they received"). Moreover, in Brovarski, this court held that an order authorizing the collection of monies owed to a plan by reason of a breach of fiduciary duty through an offset of pension benefits owed to the fiduciary does not violate ERISA's anti-alienation provision,[18] 29 U.S.C. § 1056(d)(1). See Brovarski, 1998 WL 765141, at *7-9.

b) Failure to Accurately Report Plan Assets

Here, defendants have asserted several claims of breach of fiduciary duty on the part Mr.

---

[18] See discussion infra at 30.

Katzenberg. Defendants first contend that Mr. Katzenberg breached his fiduciary duties to the Plan by failing to accurately report Plan assets.

"'Under ERISA, trustees have a fiduciary duty to act to ensure that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries.'" <u>Wilkins v. Mason Tenders Dist. Council Pension Fund</u>, 445 F.3d 572, 579 (2d Cir. 2006) (quoting <u>Diduck v. Kaszycki & Sons Contractors, Inc.</u>, 874 F.2d 912, 916 (2d Cir. 1989) (internal quotation marks and citations omitted)); <u>Liss v. Smith</u>, 991 F. Supp. at 290 (same); <u>see also</u> <u>Toussaint v. James</u>, 2003 WL 21738974, at *2 (holding that plan trustees, as supervisors of pension assets, have "'fiduciary obligations that have been described as the highest known to the law'") (quoting <u>Flanigan v. General Elec. Co.</u>, 242 F.3d 78, 86 (2d Cir. 2001) (internal citation and quotation marks omitted)).

In an Affidavit submitted in opposition to plaintiff's motion, Acme's accountant, Mr. Gough, states that based on a review of the Plan records, he determined that Mr. Katzenberg prepared certain forms used to state the Plan's assets in a way that overstated the Plan's assets for the years 1999 and 2000. (Gough Aff. ¶¶ 4-6). Specifically, Mr. Gough compared the brokerage statements from Bear Stearns Securities Corp. ("Bear Stearns") and bank statements from Citibank, N.A. ("Citibank") for the year 2000 with the Fiduciary Data Report (the "Report") for the same period, which was prepared by Mr. Katzenberg for Hallman & Lorber, the Plan actuaries. (<u>Id.</u> ¶ 5, Ex. B). According to the 2000 Report, the total amount of cash and securities held by the Plan at year end was $394,048, approximately $92,000 more than reported by Bear Stearns and Citibank. (<u>Id.</u>) A similar comparison for the year 1999 showed that Mr. Katzenberg had overstated the amount held by the Plan at year end by $15,000. (<u>Id.</u> ¶ 6, Ex. C). Moreover,

in his Affidavit, Mr. Gough further asserts that after the Amended Answer and Counterclaims was filed, he conducted a further review of the Reports prepared by Mr. Katzenberg, determining that the value of cash and securities in the Plan for 1998 was also overstated by approximately $25,000. (Id. ¶ 7).[19] Finally, defendants also claim that Mr. Katzenberg overstated Plan assets in connection with the payment of certain insurance premiums. (Gough Aff. ¶ 16).

Plaintiff disputes the accuracy of these allegations, noting that, if anything, there were more assets in the Plan as of December 31, 2000 than the amount he reported to the actuaries, including the value of various insurance policies and contribution receivables, which Mr. Katzenberg did not include in his December 2000 Report but that were included in the "Pension Plan-Valuation" prepared by Hallman & Lorber in the same year. (Katzenberg Decl. ¶ 25). Plaintiff cites additional Hallman & Lorber documents that included valuations of the Plan's assets that were greater than the value that he reported to the Plan actuaries. (Id.) Mr. Katzenberg contends that because the actuaries were aware of additional Plan assets that more than covered the amounts by which he overstated the cash and securities holdings, the mistakes he made on the 1999 and 2000 Reports did not have a "material impact on the Plan." (See Pl.'s Reply Mem. at 8). At any rate, plaintiff contends that a fiduciary "is not required to be perfect,"

---

[19]Plaintiff notes that "[d]efendants' answering papers recite a potpourri of new, previously not pleaded, purported actions taken by Katzenberg while a trustee . . . which defendants contend amount to a breach of fiduciary obligation sufficient to deny him his pension rights." (Pl.'s Reply Mem. at 2). While certain instances of plaintiff's alleged malfeasance raised by defendants in their response to plaintiff's motion for summary judgment were not detailed in defendants' Amended Answer and Counterclaims, the Court has nonetheless considered them in its analysis of plaintiff's motion for summary judgment because defendants adequately plead the defense of breach of fiduciary duty, and it is in support of that defense that defendants submitted the additional allegations of malfeasance. Consideration of the additional allegations is also appropriate given the Court's resolution of defendants' pending motion to amend the Amended Answer and Counterclaims. (See discussion infra at 41-48).

and that defendants have produced no evidence of "willful or bad faith conduct." (Pl.'s Mem. at 16-17).

With respect to the claim that plaintiff did not accurately report insurance premium payments, plaintiff disputes defendants' interpretation of a letter that he sent to the actuaries for the 1999 Plan year. (See id. at 10-12; Defs.' 56.1 Stmnt, Ex. H). Plaintiff contends that, contrary to defendants' assertion that this document was intended to be a balance sheet of Plan assets, and that plaintiff therefore wrongly included in the letter certain payments that were actually insurance contributions, plaintiff was simply responding to the actuaries' request and not presenting a certified statement of Plan assets. (See Pl.'s Reply Mem. at 11-12; Defs.' 56.1 Stmnt, Ex. H). Finally, to the extent that defendants seek to support their claim of overstatement of assets for the year 1998 with Exhibit D to their Rule 56.1 Statement of Contested Material Facts, plaintiff argues that this particular exhibit is actually the statement for 1999, not 1998, and, in any event, the crucial handwriting in Column A is not Katzenberg's handwriting. (Pl.'s Reply Decl. ¶ 5; Defs.' 56.1 Stmnt, Ex. D). Thus, he disputes the claim that he overstated the value of the Plan assets for 1998.[20]

In response to plaintiff's defense, Mr. Gough notes that even though the Plan actuaries included other assets in their valuation, among the amounts included in assessing the total assets

---

[20]At oral argument, defendants' counsel addressed the issue of the submission of the 1999 statement, claiming that the 1999 form is relevant to the 1998 statement because "[t]he first column of January 1, 1999 is the same as the last column of what would have been December 31, 1998." (Tr. at 44-46). Moreover, although Mr. Katzenberg did not fill out all of the columns on the form at issue, counsel alleges that Katzenberg "generally filled out the last column" of the yearly statement, and that the entries in the first column of the following year's report were copied from Mr. Katzenberg's entries in the last column of the previous year's statement. (Tr. at 47-48).

of the Plan were the overstated amounts of securities and cash that were detailed in Mr. Katzenberg's reports. Thus, the ultimate result was that the total value of the Plan's assets was overstated. (Gough Aff. ¶¶ 8-11). Defendants allege that by advising the actuaries that the Plan's assets were greater than their actual value, Mr. Katzenberg caused the actuaries to underestimate the amount that needed to be contributed to the Plan from Acme, thus rendering the Plan seriously underfunded.[21] (See id. ¶ 13; Defs.' Mem. at 8-10). Defendants further allege that this inured to the benefit of Acme, which was required to contribute less of its assets, and subsequently benefitted Mr. Katzenberg, who was a fifty percent owner of Acme. (See Gough Aff. ¶¶ 13, 14; Defs.' Mem. at 8).

Given that the parties dispute various material facts relating to Mr. Katzenberg's preparation of the statements of Plan assets, including the intentional nature and the materiality of such overstatements, the Court declines to recommend that summary judgment on these defenses and second counterclaim be granted at this time. There are material questions as to the origin of documents relied upon by defendants to support their claims, the extent to which the Plan may have been underfunded as a result of Mr. Katzenberg's actions, and the extent to which the actuaries relied on the information that Mr. Katzenberg provided. Resolution of these issues is necessary before the Court can determine whether, as a result of this conduct, Mr. Katzenberg should be required to reimburse the funds or, as defendants urge, should forfeit his entire pension.[22]

---

[21]The exact impact of plaintiff's alleged overstatements on the contributions to the Plan, as calculated under the relevant actuarial formula, is uncertain. (See Tr. at 24-28).

[22]The Court notes that plaintiff also argues that claims stemming from actions taken by Mr. Katzenberg in 1998, 1999, and 2000 are time-barred under ERISA's statute of limitations.

c) <u>Withdrawal of Plan Funds</u>

Defendants further contend that Mr. Katzenberg withdrew certain monies from a Plan savings account to use for corporate or personal reasons, behavior that is prohibited by ERISA. Specifically, Section 406 of ERISA prohibits a fiduciary from engaging in certain actions with respect to the funds of a plan covered by ERISA, including the "lending of money or other extension of credit between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(B). In addition, fiduciaries are prohibited from engaging in "any transaction involving the plan on behalf of a party . . . whose interests are adverse to the interests of the plan." 29 U.S.C. § 1106(b)(2). Since "[e]mployers are parties-in-interest," Liss v. Smith, 991 F. Supp. at 291 (citing 29 U.S.C. §1002(14)(C)), a transfer of plan assets to the employer clearly violates ERISA's prohibitions. See id. at 293.

In this case, according to Mr. Gough, Mr. Katzenberg opened a savings account at Citibank prior to September 1998. (Gough Aff. ¶ 15). Mr. Katzenberg told Mr. Gough that this was a Plan account, and he reported the contents of the account to the actuaries as Plan assets. (Id.) According to Mr. Gough's review of the account, however, Mr. Katzenberg made various withdrawals from this account in the spring and fall of 2000. (Id.) Monies withdrawn from this account were then deposited into Acme's checking account. (Id.) Specifically, in March 2000, after withdrawing $24,000.00 from the Plan savings account, plaintiff deposited that same amount into Acme's account. (Id.) One month later, plaintiff withdrew $24,000.00 from Acme's account and deposited that amount back into the Plan account, reporting $24,006.00 to the actuaries as a contribution and bringing the total monies in that Plan account to $31,238.54. (Id.)

---

See 29 U.S.C. § 1113. (See Pl.'s Reply Mem. at 8-9; discussion infra at 25-27).

In September 2000, plaintiff withdrew $30,000.00 from the Plan account, deposited that same amount into Acme's account, and recorded it as a personal loan from himself to Acme. (Id.) According to Mr. Gough, Katzenberg repaid himself, over a period of time, for this loan from the Acme account, but never repaid the monies into the Plan account.[23] (Id. ¶ 15).

In connection with defendants' motion to amend their amended answer and counterclaims to include these allegations, defendants submitted an additional Declaration, prepared by Israel Cartagena, assistant to Derval Lazzari, in which Cartagena indicates that he also reviewed the Plan records, Acme's checking account ledger, cancelled checks, and bank statements. (Cartagena Decl. ¶¶ 1, 3).[24] In his Declaration, Mr. Cartagena states that he "understand[s]" that when plaintiff left Acme, "all monies lent to the company by both Birinder Madan . . . and plaintiff were repaid." (Id. ¶ 3). Based on his review of the records, he was able to trace a number of the deposits and withdrawals, and he concludes that "[i]t logically follows that if all of the loans ostensibly from plaintiff were repaid, the $30,000 that he had taken from the Plan and listed as a loan from him would have been among them." (Id.) He further states that "[i]t is much more likely than not that plaintiff repaid himself the $30,000 that he took from the Plan."

---

[23]Mr. Gough further alleges that there have been other breaches of trust on the part of Mr. Katzenberg that are at issue in other lawsuits between the parties, and are therefore not addressed in this Report and Recommendation. (Id. ¶ 17).

[24]Citations to "Cartagena Decl." refer to the Declaration of Israel Cartagena in Reply to Plaintiff's Opposition to Defendants' Motion to Amend, dated July 22, 2006. Given that the Court would arrive at the same conclusion regardless of whether it considered this Affidavit, which was submitted after the plaintiff's motion for summary judgment was fully briefed, the Court need not rule on its admissibility for purposes of the summary judgment motion.

(Id. ¶ 4). He contends that production of plaintiff's bank records[25] would allow defendants to demonstrate that the monies listed as loans were repaid to plaintiff. (See id. ¶ 5). Mr. Cartagena further states that, contrary to plaintiff's claim that the beneficiaries were not injured by the transaction involving the $30,000 withdrawal, "several of the employees of Acme were unable to get their pension benefits in a lump sum to which they were entitled" as a result of plaintiff's actions. (Id. ¶ 6). He does not, however, provide any specific information to support this assertion. (See id.)

With respect to the claim that he withdrew $24,000 from the Plan on March 28, 2000, Katzenberg concedes that Acme did so, but claims that the transaction was conducted with the consent of his fellow Trustee, Birinder Madan, who was also a fifty percent partner in Acme. (Pl.'s Reply Decl. ¶ 6). He represents that they took the money from the Plan account to re-pay Acme's loans to Citibank, but that the money was in fact restored to the Plan one month later. (Id. ¶ 7). Katzenberg further contends that any loss that may have occurred as a result of this transaction was *de minimus* and cannot justify complete denial of his benefits. (Id. ¶ 8).

Finally, to the extent that defendants have accused plaintiff of withdrawing $30,000 from the Plan and depositing it into Acme's account, plaintiff claims that he does not "specifically recall this transaction" and notes that he is "not contesting defendants' contention that Acme American Repairs withdrew $30,000 from the Plan." (Id. ¶ 12). However, he does dispute defendants' contention that the monies were eventually paid to him, stating: "[i]n fact, there is

_____

[25]During the pendency of the motion for summary judgment, defendants sought to compel production of plaintiff's bank records in order to supplement their submissions. On July 31, 2006, that discovery was held in abeyance pending this Court's review of the outstanding motions.

no evidence to support this contention." (Id. ¶ 13). He speculates that, because it was a common

practice for him and Madan to loan money to the company, the monies at issue may have been

used for operating expenses or to repay a loan from Madan. (Id. ¶ 14). Conceding that this

transfer took place while he was a fiduciary, plaintiff argues that if the funds were never returned

to the Plan, defendants, at most, would be entitled to an offset to his pension. (Id. ¶ 15). He

further contends that Madan, who was also a Trustee at the time of the transaction in question,

should also be held responsible for the breach of fiduciary duties. (See id.)

Not only does Mr. Katzenberg dispute a number of material facts regarding the transfers

raised by defendants, but he further contends that these claims that he improperly transferred

funds from the Plan into Acme's account are barred by ERISA's statute of limitations. The

limitations provisions for ERISA claims is set forth in 29 U.S.C. § 1113, which provides as

follows:

> No action may be commenced under this title with respect to a
> fiduciary's breach of any responsibility, duty, or obligation under
> this part, or with respect to a violation of this part, after the earlier
> of--
>
>> (1) six years after (A) the date of the last action which
>> constituted a part of the breach or violation, or (B) in the
>> case of an omission, the latest date on which the fiduciary
>> could have cured the breach or violation, or
>>
>> (2) three years after the earliest date on which the plaintiff
>> had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be
> commenced not later than six years after the date of discovery of
> such breach or violation.

29 U.S.C. § 1113. Plaintiff relies on subsection (2) of the statute to argue that defendants'

counterclaim alleging breach of fiduciary duty based on the September 2000 transaction is time-

25

barred, because defendants had actual knowledge of the conduct underlying the claim for more than three years prior to the initiation of the lawsuit. (See Pl.'s Reply Mem. at 4-6). Plaintiff raises a similar argument concerning the spring 2000 transaction.[26] (Id. at 9-10).

In furtherance of the statute of limitations argument, plaintiff contends that the transactions involving the transfer of funds were not concealed in any way. Citing Oechsner v. Connell Ltd. P'ship, plaintiff argues that under Second Circuit law, a party "has actual knowledge of the breach or violation . . . when he had knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act." (Pl.'s Reply Mem. at 4 (citing Oechsner v. Connell Ltd. P'ship, 101 Fed. Appx. 849, 850 (2d Cir. 2004) (quoting Caputo v. Pfizer, Inc., 267 F.3d 181, 193 (2d Cir. 2001)).[27] With respect to the withdrawal of the $30,000, plaintiff argues that this claim is time-barred because the transfer was recorded at the time of the transaction, in Katzenberg's own handwriting, in the books and records kept by Acme and the Plan.[28] (See Pl.'s Reply Mem. at 5). Thus, plaintiff contends that defendants had actual knowledge of all material facts necessary to bring the breach the fiduciary claim as of that date. (Id.) Even if it is argued that defendants could not have been aware of this transfer because Katzenberg was the individual responsible for maintaining the records, plaintiff argues that defendants should have been aware of the transfer, at the latest,

---

[26]Indeed, with respect to defendants' counterclaims, plaintiff notes that such claims were "interposed even later" than the 2004 filing of the lawsuit. (Id. at 6).

[27]Although plaintiff cites to Oechsner in his submissions, which is a summary order of limited precedential value, the quoted holding is originally from Caputo, a decision afforded full precedential value.

[28]Copies of the accounting book entries for September 2000 are attached as Exhibit G to defendants' Rule 56.1 Statement of Contested Material Facts.

when Katzenberg left the company in March 2001. (See id.) Plaintiff raises the same argument relative to the March 2000 withdrawal of $24,000, noting that defendants had actual knowledge of the transaction when it occurred, as it "was plainly recorded in the books and records of the Plan, Acme American Repairs, and, of course, at least according to defendants, it caused 'harm' to the Plan." (Id. at 10). Moreover, plaintiff contends that the fact that defendants may not have examined the records until recently does not excuse their failure to discover the facts necessary to bring the claim at an earlier date. (Id. at 5). See Edes v. Verizon Commc'ns, Inc., 417 F.3d 133, 142 (1st Cir. 2005) (citing Martin v. Consultants & Adm'rs, Inc., 966 F.2d 1078, 1086 n.7 (7th Cir. 1992)) (holding that Congress did not "intend[ ] the actual knowledge requirement to excuse willful blindness by a plaintiff").

Although defendants did not address plaintiff's arguments that the claims are time barred in their response to plaintiff's motion for summary judgment, they did address the issue of the statute of limitations, with respect to their proposed counterclaims, in their motion to amend. There, they argued that because plaintiff's actions involved fraud and concealment, the applicable statute of limitations is six years. (Defs.' Reply Mem. at 5-6). Defendants further contest the ease with which plaintiff's malfeasance was discovered, claiming that even if the applicable statute of limitations is three years, defendants did not have actual knowledge of the $30,000 withdrawal until less than three years ago because plaintiff "conceal[ed] his embezzlement from the Plan." (See id. at 6).[29]

---

[29] Citing Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co., 122 F. Supp. 2d 444 (S.D.N.Y. 2000), aff'd in part, rev'd in part, 302 F.3d 18 (2d Cir. 2002), defendants contend that "plaintiff concealed the facts through intricate schemes" and that the fraud could not have been discovered simply by examining the financial records. (See Defs.' Reply Mem. at 8-9). Based on Mr. Gough's statements, the Court finds that there are issues of fact regarding the ease

Apart from the issues that prevent the Court from finding the claims time-barred, plaintiff has raised numerous other issues of fact which preclude the Court from granting summary judgment at this time. He has questioned defendants' assertions regarding the transfers of money from the Plan account, including their purpose and the ultimate disposition of the funds. Perhaps most importantly, however, he has raised a legitimate question as to whether denial of all of his benefits is an appropriate remedy given the defendants' failure to support their claims that the money was repaid to him and the Court's discretion in fashioning the appropriate remedy for breach of fiduciary duty.[30] Thus, under these circumstances, the Court concludes that there are material issues of fact in dispute that preclude the grant of summary judgment on the issues raised by defendants' affirmative defense relating to plaintiff's breach of fiduciary duty and by defendants' second counterclaim.[31]

2) Waiver

Defendants' second argument in opposition to plaintiff's claim of entitlement to benefits

---

with which these alleged breaches of fiduciary duty could have been discovered. While Mr. Gough discovered the underfunding when asked to make arrangements for a retiring Plan participant (see Defs.' Amended Answer and Counterclaims ¶ 66), defendants' submissions indicate that the transfers and alleged embezzlement were not easily identified. (See Gough Aff. ¶¶ 5-7, 15, 16 (detailing the processes by which the alleged breaches were identified); Cartagena Decl. ¶¶ 3, 4, 8) (same)).

[30]Section 1109 of ERISA provides, for example, that a fiduciary who breaches his duties with respect to a plan "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach" and that the fiduciary "shall be subject to such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. § 1109(a).

[31]As previously noted, the Court passes no judgment on plaintiff's motion for summary judgment with respect to defendants' first counterclaim given the Court's recommended resolution of defendants' pending motion to amend. (See discussion infra at 41-48).

28

is that plaintiff agreed to waive his right to pension benefits.

According to defendants, Mr. Katzenberg attended a meeting in or about December 6, 2001, at which he allegedly stated, in the presence of Madan, Lazzari, and Gough, that he was waiving his rights to any benefits under the Plan. (Gough Aff. ¶ 20). Defendants further contend that plaintiff never objected when the trustees sent him a statement for the year 2001 indicating that the value of his interest in the Plan was "0." (Id.) Instead, they claim that it was only when he was later sued by Acme that he "decided to claim his pension benefits." (Id.)

Mr. Katzenberg, however, denies that he actually waived his benefits. (Pl.'s Decl. ¶ 22). He argues that defendants, in their Response to Interrogatory No. 24, "in essence admit that I never waived my benefits." (Id.; Gelfarb Decl., Ex. N). Specifically, defendants noted in their Interrogatory Response that Mr. Katzenberg had stated that "he would walk away from his benefits under the Plan, but Birinder Madan would have to do likewise. Mr. Madan noted that he had been with the ACME Companies much longer than Mr. Katzenberg and refused to walk away from his benefits under the Plan." (Gelfarb Decl., Ex. N; Pl.'s Mem. at 11). Plaintiff contends that the "plain meaning" of defendants' contentions indicates that he only agreed to waive his rights to benefits under the Plan if Madan agreed to do the same. (Pl.'s Mem. at 11). Plaintiff further contends that because Madan refused to waive his benefits, the "logical result" is that Katzenberg also refused to waive his rights. (Id.) In this manner, Mr. Katzenberg argues that defendants' own answers to interrogatories indicate that they are aware that he did not waive his rights to his benefits. Thus, there is sharp disagreement as to whether plaintiff's statement at this meeting was intended as a concrete waiver of his benefits.

Plaintiff further argues that the "sense of [Supreme Court precedent] is that vested

29

pension benefits cannot be 'waived.'" (Pl.'s Mem. at 10 (citing Alessi v. Raybestos - Manhattan Inc., 451 U.S. 504, 510-11 (1981)).[32] Under ERISA, benefits provided by a plan may not be assigned or alienated. 29 U.S.C. § 1056(d)(1). This anti-alienation provision, however, "'does not impose a bar on settlement agreements wherein pension claims are knowingly and intentionally resolved by employees.'" Lynn v. CSX Transp., Inc., 84 F.3d 970, 975 (7th Cir. 1996) (internal citations omitted); see also Rhoades v. Casey, 196 F.3d 592, 594, 598-600 (5th Cir. 1999) (concluding that ERISA's anti-alienation provision had not been violated where trustee executed a written consent agreement in which he waived his retirement benefits in exchange for a federal agency's agreement not to pursue formal administrative litigation against him for alleged misdeeds that included breach of fiduciary duties); Finz v. Schlesinger, 957 F.2d 78, 80-83 (2d Cir.) (upholding a trial attorney's agreement to waive any claims to his interest in the firm's employee pension plan as knowing and voluntary, where plaintiff entered into the agreement after concluding his employment with defendants in order to "avoid litigation over any potential claims" and believed that he was entitled to benefits despite defendants' representations

---

[32]While plaintiff cites Alessi v. Raybestos-Manhattan, Inc. in support of his assertion that vested pension benefits cannot be waived (Pl.'s Mem. at 10), Alessi addresses the implications of the ERISA provision that "establishes that '[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age.'" See Alessi v. Rabyestos-Manhattan, Inc., 451 U.S. at 510-17 (refusing to credit a claim advanced by retired employees that the "nonforfeiture provisions by their own force prohibit any offset of pension benefits by workers' compensation awards"). Since plaintiff's submissions indicate that he has not yet reached "normal retirement age" (see Compl. ¶¶ 21, 22; Pl.'s Decl. ¶ 8 (noting that the Plan provides that 65 is the "normal retirement age" and claiming that plaintiff – who retired over four years before submitting the Declaration – was entitled to a distribution of benefits under a provision that allows participants who terminate employment before reaching the age of 65 to receive their benefits after a one year break in service)), ERISA's nonforfeiture provision is inapplicable in this instance. Thus, the Court has addressed plaintiff's argument concerning his alleged waiver under the seemingly more applicable anti-assignment provision.

to the contrary), cert. denied, 506 U.S. 822 (1992); Linder v. Byk-Chemie USA, Inc., No. 02 CV 1956, 2006 WL 648206, at *12 (D. Conn. Mar. 10, 2006) (noting that "'the anti-alienation provision, while clearly manifesting Congress's intent to protect workers from unknowingly signing away their vested pension benefits, does not impose a bar on settlement agreements wherein pension claims are knowingly and intentionally resolved by employees,'" and upholding validity of a release and covenant not to sue executed by an employee who was aware of unresolved issues concerning the calculation of his pension at the time of execution) (internal citations omitted).

Similarly, the Second Circuit has held that "an individual generally may waive the right to participate in a pension plan governed by ERISA." Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan, 935 F.2d 1360, 1366 (2d Cir. 1991) (holding that "[a]llowing an individual to relinquish his opportunity to 'fulfill[ ] whatever conditions are required' to qualify for benefits is not inconsistent with protecting the legitimate expectations of those who are entitled to benefits") (internal citation omitted).

Recognizing the potential for employer abuse, however, courts have cautioned that a claim of waiver must "be carefully examined to ensure that it is knowingly and voluntarily made." Id. at 1367; see also Yablon v. Stroock & Stroock & Lavan Ret. Plan & Trust, No. 01 CV 452, 2002 WL 1300256, at *4 (S.D.N.Y. June 11, 2002) (noting that "'the validity of a waiver of pension benefits under ERISA is subject to closer scrutiny than a waiver of general contract claims'") (internal citation omitted), aff'd, 98 Fed. Appx. 55 (2d Cir. 2004). In Finz v. Schlesinger, the court identified six factors to examine in order to determine whether an employee knowingly and voluntarily waived ERISA benefits, including "the amount of time the

plaintiff had possession of or access to the agreement before signing it," the "clarity of the agreement," "whether the plaintiff was represented by or consulted with an attorney," and "whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law." 957 F.2d at 82 (quoting Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan, 935 F.2d at 1368); see also Bormann v. AT&T Commc'ns., Inc., 875 F.2d 399, 403 (2d Cir.), cert. denied, 493 U.S. 924 (1989).

Apart from the fact that the parties vigorously dispute whether a waiver in fact occurred, defendants in this case seek to enforce an alleged oral waiver of benefits by Mr. Katzenberg. The Court has located no authority, and neither party has cited to any in its submissions to the Court, in which a beneficiary has effectuated an oral waiver of his or her right to pension benefits. The dearth of precedent on the validity of oral waivers is in accordance with the emphasis placed by ERISA on reducing promises to writing. See Frahm v. Equitable Life Assurance Soc'y of the United States, 137 F.3d 955, 958 (7th Cir.) (noting that "the utility of reducing retirement promises to writing and avoiding arguments about who said what to whom are so fundamental to both ERISA and contract law that an extension of the writing requirement to all long-term commitments is an inescapable ingredient of the federal common law slowly accumulating in ERISA's shadow"), cert denied, 525 U.S. 817 (1998). Indeed, an examination of the factors cited in Laniok and Finz further demonstrate the importance of a written agreement prepared and considered with the advice of counsel. No such agreement is present in this case, nor does there appear to have been any consideration offered to Mr. Katzenberg at the time of the alleged

waiver.[33]

Presumably in response to plaintiff's contentions concerning the enforceability of an oral waiver, defendants contend that, in reliance upon plaintiff's oral waiver of his pension benefits, the Plan actuaries did not include the cost of his benefits in their calculation of the necessary contributions. (Defs.' 56.1 Stmnt ¶ 4).[34] Defendants note that "[t]he doctrine of promissory estoppel is often applied to enforce an oral promise that is otherwise required by law to be in writing." (Defs.' Mem. at 15). Citing various Second Circuit case law, defendants argue that promissory estoppel may be applied in cases involving ERISA in "'extraordinary circumstances.'" (Id. (quoting Aramony v. United Way Replacement Benefit Plan, 191 F.3d 140, 151 (2d Cir. 1999)); see also Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 85-86 (2d

---

[33]In their Response to Interrogatory No. 24, defendants indicated that the alleged waiver occurred after Mr. Gough reported to Mr. Katzenberg that the Plan was underfunded in 2000, a circumstance that, at the time, Gough characterized to Katzenberg as an "'error.'" (Gelfarb Decl., Ex. N). According to defendants' Interrogatory Response, there was no accusation at that time that Mr. Katzenberg had engaged in misconduct resulting in the underfunding, and thus the alleged offer to waive benefits cannot be considered as a settlement of defendants' claims against Mr. Katzenberg. Indeed, the discussion appears to have involved a disagreement between Katzenberg and Madan over whether or not they both agreed to freeze their benefits when they acquired Acme. (Id.)

[34] The Court notes that the argument advanced in defendants' Memorandum of Law, which appears to be that the reliance by the Plan actuaries on fiduciary reports prepared by Katzenberg merits the enforcement of his oral waiver of his pension benefits (see Defs.' Mem. at 14-16), misconstrues the doctrine of promissory estoppel. That is, while defendants treat the fiduciary report misrepresentations as the "promise" that they relied upon, they seek to employ the doctrine of promissory estoppel to enforce an entirely different promise – the oral promise that Katzenberg allegedly made to forego his pension benefits under the Plan. (See id.) Thus, the formulation of the promissory estoppel claim advanced in defendants' Rule 56.1 Statement of Contested Material Facts more closely comports with the doctrine's requirements.

33

Cir. 2001) (noting that where the four elements of promissory estoppel[35] are established, "'[p]rinciples of estoppel can apply in ERISA cases under extraordinary circumstances'") (internal citation omitted), cert. denied, 537 U.S. 1170 (2003).

None of the cases cited by defendants concern the type of waiver alleged in this case. Absent any authority to support the claim that the circumstances here would qualify as "extraordinary" in a way that would merit the application of promissory estoppel even if defendants had properly plead the affirmative defense,[36] the Court concludes that the appropriate standard to be applied is the standard for a knowing and voluntary waiver set out in Laniok and Finz.

Accordingly, because defendants' own recitation of the circumstances surrounding the alleged oral waiver of plaintiff's pension benefits fails to even begin to satisfy the standards for a waiver of ERISA benefits, it is respectfully recommended that summary judgment be granted in favor of plaintiff, striking this defense to plaintiff's claim for pension benefits.


D. Plaintiff's Second Cause of Action - Failure to Provide Plan Documents

Plaintiff's next claim is that he was entitled to receive certain benefit information and Plan documents because he was a participant in the Plan, and that defendants' failure to provide

---

[35]The basic elements of a promissory estoppel claim include: (1) a promise, (2) reliance upon that promise, (3) injury caused as a result of the reliance, and (4) resulting injustice if the promise is not enforced. Id. at 85.

[36]Plaintiff contends that defendants have not previously plead the "defense that Katzenberg's claim for benefits is barred by the doctrine of promissory estoppel." (Pl.'s Reply Mem. at 12). Pursuant to the Federal Rules of Civil Procedure, estoppel is one of the affirmative defenses that "a party shall set forth affirmatively" when "pleading to a preceding pleading." Fed. R. Civ. P. 8(c).

such information was in violation of ERISA.

ERISA mandates that every employee benefit plan be "established and maintained pursuant to a written instrument." 29 U.S.C. §1102(a)(1). The written instrument furnished to participants and beneficiaries of any employee benefit plan, referred to under ERISA as a "summary plan description," or "SPD," must be a "thorough and easy to understand summary of the benefit plan." Layaou v. Xerox Corp., 238 F.3d 205, 209 (2d Cir. 2001); see also 29 U.S.C. § 1022(a). ERISA mandates that the summary plan description contain an extensive variety of information, including "the plan's requirements respecting eligibility for participation and benefits."[37] 29 U.S.C. § 1022(b). Since "the general purpose of ERISA is to protect workers from abuses in the administration and investment" of employee benefit plans, Bennett v. Gill & Duffus Chemicals, Inc., 699 F. Supp. 454, 457-58 (S.D.N.Y. 1988) (internal citation omitted), ERISA requires the plan administrator to distribute the summary plan documents to each participant, 29 U.S.C. §§ 1021(a), 1022(a), 1024(b), so that they may be aware of the terms of the plan and thus protect themselves from abuses. See Kascewicz v. Citibank, N.A., 837 F. Supp. 1312, 1318 (S.D.N.Y. 1993).

It is clear that under ERISA, the summary plan description is the participants' and beneficiaries' primary source of information regarding an ERISA plan. See Layaou v. Xerox Corp., 238 F.3d at 211 (noting that "employees are entitled to rely on the SPDs as their primary source of information about their benefits") (internal citation omitted); Heidgerd v. Olin Corp.,

---

[37]For example, ERISA requires that the summary plan description list "the name and address of the administrator," the "names, titles, and addresses of any trustee or trustees (if they are persons different from the administrator)," and "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b).

906 F.2d 903, 907 (2d Cir. 1990); <u>Moore v. Metropolitan Life Ins. Co.</u>, 856 F.2d at 492. The courts have made it clear that an ERISA welfare plan cannot be modified by informal communications between an employer and plan beneficiaries "absent a particularized showing of conduct tantamount to fraud." <u>See, e.g.</u>, <u>Moore v. Metropolitan Life Ins. Co.</u>, 856 F.2d 488, 489, 492 (2d Cir. 1988). As the court in <u>Moore</u> noted: "[w]ere all communications between an employer and plan beneficiaries to be considered along with the SPDs as establishing the terms of a welfare plan, the plan documents and the SPDs would establish merely a floor for an employer's future obligations. Predictability as to the extent of future obligations would be lost . . . ." <u>Id.</u>

Under ERISA, a plan administrator "shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description . . . or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). ERISA further dictates that "[a]ny administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . . within thirty days after such request may in the court's discretion be personally liable . . . in the amount of up to $100 a day from the date of such failure or refusal." 29 U.S.C. § 1132(c)(1). The statutory penalty is, however, "designed more to punish irresponsible ERISA administrators and fiduciaries than to compensate the [plaintiff] for an actual loss." <u>Scarso v. Briks</u>, 909 F. Supp. 211, 215 (S.D.N.Y. 1995); <u>see also</u> <u>Kascewicz v. Citibank, N.A.</u>, 837 F. Supp. at 1322-23.

In deciding whether such a penalty is appropriate, "courts have considered such factors as bad faith or intentional conduct on the part of the administrator, the length of the delay, the

number of requests made and documents withheld, and the existence of any prejudice to the participant or beneficiary." Pagovich v. Moskowitz, 865 F. Supp. 130, 137 (S.D.N.Y. 1994) (gathering cases). Notably, courts in this Circuit disagree on whether bad faith and prejudice to the plaintiff are prerequisites to a statutory penalty or merely factors to consider. See Austin v. Ford, No. 95 CV 3730, 1998 WL 88744, at *6 (S.D.N.Y. Mar. 2, 1998) (noting that "[n]o one of these factors is necessary, and thus even the absence of prejudice does not necessarily defeat the imposition of a penalty"); Almonte v. General Motors Corp., 1997 WL 363815, at *4-5 (discussing the disagreement within the Circuit and treating bad faith and prejudice merely as factors to be considered). In addition to these factors, some courts have considered whether the request for documents was made in good faith in determining the magnitude of the penalty to impose. See, e.g., McConnell v. Costigan, No. 00 CV 4598, 2002 WL 1968336, at *2-5 (S.D.N.Y. Aug. 23, 2002) (imposing a penalty of $10 per day under Section 1132(c) after "[w]eighing the defendants' bad faith and contempt for important duties under ERISA[ ] with the plaintiffs' ulterior motives and lack of prejudice," where "plaintiffs' quickness to sue [was] evidence that they did not request the information entirely in good faith").

Plaintiff asserts that he requested information that would help him determine his rights under the Plan as early as August 10, 2004.[38] (Pl.'s Mem. at 19). According to plaintiff,

---

[38]Plaintiff has submitted a letter, dated August 10, 2004 and addressed from his attorneys to Mr. Greenberg, an individual who plaintiff alleges formerly represented defendants, in which plaintiff's counsel notes that "[t]o date, we have received no documents needed to effect a rollover/distribution, nor have we received any written explanation that they are somehow not eligible for benefits." (See Gelfarb Decl., Ex. M). The letter advises counsel that "if we do not promptly receive the requested documentation and information, our clients will take all steps necessary to protect their legal rights." (Id.) Although not specifically mentioned in the letter, plaintiff alleges that the summary plan description is the document that would have enabled him to "determin[e] why he is allegedly, according to defendants, not eligible for benefits." (See Pl.'s

37

defendants, through counsel, eventually acknowledged his requests and forwarded certain documents to Katzenberg. (Id.) However, plaintiff claims that he has never received a copy of the summary plan description.[39] Accordingly, Mr. Katzenberg seeks the imposition of the maximum statutory penalty available based on the defendants' failure to provide him with the information that he demanded in accordance with ERISA's provisions, and asks that the Court direct Acme to furnish a summary plan description. (Id. at 19-20).

Defendants contend that "[u]ntil the commencement of this lawsuit plaintiff never requested a copy of the Summary of the Plan in writing." (Defs.' 56.1 Stmnt ¶ 5; Defs.' Mem. at 5 (noting that "[t]here is no request for a Summary of the Plan in any of the correspondence" that plaintiff provides as evidence of his written request)). With respect to plaintiff's claim that he never received a summary plan description, defendants' accountant notes that Mr. Katzenberg was the administrator of the Plan from at least 1995 to March 2001, and therefore received annual copies of the Summary of the Plan from the actuaries. (Gough Aff. ¶ 18). In support of this assertion, defendants point to a letter sent to Mr. Katzenberg from Hallman & Lorber in February 2000, which purports to annex a copy of the Summary of the Plan. (See Gough Aff. ¶ 18, Ex. J). Since the Plan was frozen in late 2001, defendants argue that there was no need to send plaintiff another copy of the Summary of the Plan. (See Defs.' Mem. at 18). Moreover, defendants contend that in the absence of any showing that plaintiff was harmed as a result of

_____

Reply Mem. at 15-16).

[39]The Court notes that while plaintiff alleged in his Complaint that defendants had refused to provide a copy of the Plan and the summary plan description (Compl. ¶ 28), plaintiff's papers in support of his motion for summary judgment state only that he has not yet received a copy of the summary plan description. (Pl.'s Mem. at 19-20).

defendants' failure to provide the summary plan description, defendants contend that plaintiff may not recover damages. (See id. at 17 (citing cases)).

In his Reply, plaintiff contends that the document attached to the actuaries' letter is a "summary of the Plan," not a summary plan description as required by ERISA, which he still has not received. (See Pl's. Reply at 14-16). Indeed, while defendants have provided the Court with a copy of the actuaries' letter, which attaches a "Summary of Plan Provisions," they have not submitted a copy of a summary plan description.

While defendants originally indicated that another document, the Summary of the Plan, was the document that they believed was allegedly at issue in plaintiff's second cause of action (see Defs.' Mem. at 5-6, 17-18), defendants' counsel stated at oral argument that, despite "tr[ying] "very hard to get it," his clients could not locate any copies of a summary plan description and, in fact, did not even know if any copies of an SPD ever existed. (See Tr. at 40-41). Defendants' counsel further indicated that the "annual report" might be "what [the SPD] is deemed nowadays." (Id. at 41). Counsel also suggested that Mr. Katzenberg, who "handled all of [Acme's] financials," may have acquired the only copy of the summary plan description while acting as Plan administrator, and that the SPD may have been part of the group of documents that Mr. Katzenberg took with him when he left the company that were allegedly destroyed in a subsequent flood in plaintiff's home.[40] (Id. at 40-41).

Having considered the parties' submissions, the Court finds that there are material issues

---

[40]As referenced in oral argument, defendants submitted a letter written by Pearl Feuer, who the Court presumes is Pearl Katzenberg given the letter's discussion of Acme and the author's indication that she and Harvey were "an item," which indicates that certain records stored in Ms. Feuer's household were destroyed in a flood. (Gough Aff., Ex. A at 22-25).

of fact in dispute that preclude it from awarding summary judgment to plaintiff at this juncture. Perhaps most importantly, defendants dispute whether plaintiff ever specifically requested a copy of the SPD. Indeed, plaintiff's counsel's August 10, 2004 letter does not specifically mention the SPD, and the documents that counsel specifically requested in the letter do not appear to fall within the group of documents that ERISA requires the Plan administrator to produce under Section 1024(b)(4).[41] Moreover, there are issues of fact as to whether Mr. Katzenberg requested the SPD in good faith, as defendants have alleged that plaintiff may have been in possession of Acme's only copy of the summary plan description. Additionally, there are questions of fact concerning whether, apart from the "Summary of the Plan" document that was annually disseminated to Mr. Katzenberg by the actuaries, a separate "summary plan description" was ever prepared or disseminated to anyone. Presumably, given plaintiff's role as trustee and acting administrator of the Plan, he would have seen a copy of the summary plan description at some point during his tenure, yet there is nothing in the record to indicate whether, in fact, he ever saw or received a copy of such a document. Given plaintiff's presumed familiarity with the Plan, this may provide further evidence of bad faith.

Accordingly, the Court respectfully recommends that plaintiff's motion for summary judgment as to his second cause of action be denied.[42]

---

[41]See, e.g., Medoy v. Warnaco Employees' Long Term Disability Ins. Plan, 43 F. Supp. 2d 303, 309-10 (E.D.N.Y. 1999) (holding that "individual claims determination records do not fit within" the category of "'formal legal documents that govern or confine a plan's operations'" that are required to be disclosed under Section 1024(b)(4)) (internal citation omitted).

[42]Given the Court's resolution of plaintiff's various summary judgment motions, it is respectfully recommended that plaintiff's motion for summary judgment as to his third cause of action, which seeks attorneys' fees and costs under 29 U.S.C. § 1132(g), be denied, without prejudice subject to renewal following the Court's final disposition of the case.

## II. DEFENDANTS' MOTION TO AMEND

By Notice of Motion dated June 26, 2006, defendants moved to amend their Amended Answer and Counterclaims pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Defendants have also withdrawn certain claims set forth in the Amended Answer,[43] which they contend are the subject of other lawsuits pending between the parties.

### A. Standards

As a general matter, Rule 15(a) of the Federal Rules of Civil Procedure provides that one amendment as of right may be made at any time prior to the service of a responsive pleading. Once a response to a complaint or to a counterclaim has been filed, however, a party may amend the pleading "only by leave of court or by written consent of the adverse party." Fed. R. Civ. P. 15(a). However, the Rule also states that "leave shall be freely given when justice so requires," and the Rule has been liberally construed. See Foman v. Davis, 371 U.S. 178, 182 (1962). As the court in Chapman v. YMCA of Greater Buffalo noted, "[t]he stated purpose of Rule 15 is to allow a party to correct an error that might otherwise prevent the court from hearing the merits of the claim." 161 F.R.D. 21, 24 (W.D.N.Y. 1995).

Although leave to amend "shall be freely given when justice so requires," Fed. R. Civ. P. 15(a), the decision whether to grant a party's motion to file an amended pleading remains within the court's discretion, Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995), and an amendment may be denied where the party seeking leave to amend has demonstrated bad faith or

---

[43]One of the counterclaims that plaintiff seeks to delete, which sought relief on behalf of Lazzari, was included in plaintiff's motion for summary judgment. (See discussion supra at 5-6).

dilatory motives, where there has been undue delay, where the amendment would be futile or would cause undue prejudice to the opposing party, or where there has been "repeated failure to cure deficiencies by amendments previous allowed." See Foman v. Davis, 371 U.S. at 182; see also Littlejohn v. Artuz, 271 F.3d 360, 363 (2d Cir. 2001); Zahra v. Town of Southold, 48 F.3d at 685; John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp., 22 F.3d 458, 462 (2d Cir. 1994); Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993). "The party opposing the motion for leave to amend has the burden of establishing that an amendment would be prejudicial." Fariello v. Campbell, 860 F. Supp. 54, 70 (E.D.N.Y. 1994) (citing Panzella v. Skou, 471 F. Supp. 303, 305 (S.D.N.Y. 1979)).

Among the factors the court must consider in granting discretionary leave to amend is whether the amendment would be futile in that it fails to state a valid claim. See Chapman v. YMCA of Greater Buffalo, 161 F.R.D. at 23-24. When a party objects to a proposed amendment on the ground of legal insufficiency, the court should apply the same test that is used to evaluate a pleading when it is challenged under Rule 12(b)(6) of the Federal Rules of Civil Procedure. See id. at 23. Thus, this Court must accept all well-pleaded allegations in the counterclaims as true, and construe the counterclaims liberally in the light most favorable to the defendants. See 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure Civ. 3d § 1357 (2004). Only if there is no set of facts that, if proved, would constitute a valid and sufficient claim as amended, should leave to amend be denied. See Chapman v. YMCA of Greater Buffalo, 161 F.R.D. at 23.

Also among the factors that the court must consider is whether the amendment would cause undue prejudice to the opposing party. See Block v. First Blood Assocs., 988 F.2d at 350.

In determining what constitutes prejudice, the court must consider whether the assertion of the new claims would: "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." Id. (internal citations omitted). "'Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.'" Id. (quoting State Teachers Ret. Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981)).

B.  Application

Based on a review of the proposed Second Amended Answer and Counterclaims, it appears that defendants are seeking to add four new claims based primarily on Mr. Gough's findings during his recent audit of the Plan. Specifically, defendants seek to add a claim that Katzenberg withdrew $30,000 from the Plan, which he coded as a "loan" from himself to Acme, and then repaid himself $30,000 over the course of the following year from monies taken from the Acme account.[44] (Sec. Am. Ans. ¶ 45).[45] The defendants also seek to add claims against Mr. Katzenberg with respect to (1) the overstatement of Plan assets for the year 1998 (id. ¶ 26); (2) the overstatement of Plan assets in connection with insurance premiums (id. ¶ 46); and (3) a spring 2000 transaction involving the withdrawal of $24,000 from the Plan's saving account. (Id. ¶ 44). Defendants argue that they currently seek to amend in order to add these claims because

---

[44]That claim, raised as an equitable argument in opposition to plaintiff's claim for pension benefits, is more fully described supra at 22-27.

[45]Citations to "Sec. Am. Ans." refer to defendants' proposed Second Amended Answer and Counterclaims.

plaintiff has asserted that these acts of alleged malfeasance were not alleged in the Amended Answer and Counterclaims, and that they should therefore not be considered by the Court in its assessment of plaintiff's request for his pension benefits. (See Sandler Aff. ¶ 4).[46] Defendants assert that they were not dilatory in moving to add these claims, as it has taken them "a considerable amount of time to trace plaintiff's machinations." (Defs.' Reply Mem. at 2-3).[47]

Plaintiff objects to the proposed amendments on several grounds. First, plaintiff argues that the motion should be denied because there has been undue delay and defendants have been dilatory in seeking to file the amendment. (Pl's. Mem. in Opp. at 3-4).[48] Specifically, plaintiff indicates that although Mr. Gough submitted an Affidavit in December 2005, in connection with plaintiff's motion for summary judgment, which identified the issues raised in the amendments, defendants waited until June 2006 to move to amend. (Id. at 3).

In his Declaration, Israel Cartagena explains that there was nothing dilatory about defendants' actions in moving to amend the Amended Answer and Counterclaims. (Cartagena Decl. ¶ 8). Discussing the $30,000 transfer in particular, he states that he and Mr. Gough were reviewing the books and records "to confirm the facts as much as possible before moving to amend." (Id.) Mr. Cartagena further explains that by labeling this transfer as a loan from himself

---

[46]Citations to "Sandler Aff." refer to the Affirmation of Lewis S. Sandler, Esq. in Support of [Defendants'] Motion to Amend the Amended Answer and Counterclaims, dated June 27, 2006.

[47]Citations to "Defs.' Reply Mem." refer to the Defendants' Memorandum in Reply to Plaintiff's Memorandum in Opposition to Defendants' Motion to Amend the Amended Answer and Counterclaims, dated July 24, 2006.

[48]Citations to "Pl.'s Mem. in Opp." refer to Plaintiff Harvey Katzenberg's Memorandum of Law in Opposition to Defendants' Motion to Amend the Amended Answer with Counterclaims, dated July 17, 2006.

to Acme, Mr. Katzenberg was able to "siphon off $30,000 from the Plan." (Id. ¶ 7). Mr. Cartagena contends that "[t]he manoeuvre was highly secretive and a fraud upon Madan and the Plan." (Id.)

Although plaintiff argues that the books and records have been available for review since Mr. Katzenberg left Acme several years ago, the Court concludes, based on the sworn statements of Mr. Gough and Mr. Cartagena, that defendants acted diligently once they became alerted to the possibility that there were certain questionable transactions. Had defendants not thoroughly investigated the foundation of their claim, they may have faced possible sanctions for asserting an unsupported claim. Indeed, plaintiff criticizes defendants for having raised in their initial set of counterclaims a number of claims that defendants are now seeking to withdraw. (See Pl.'s Mem. in Opp. at 13-16). Accordingly, the Court concludes that there is no significant lack of diligence or delay that would justify denying defendants' motion to amend.

Plaintiff further urges that the amendments should be denied on grounds of futility. (Id. at 4-13). With respect to the claim arising out of Mr. Katzenberg's alleged withdrawal of $30,000, plaintiff asserts that there has been no showing that plaintiff directly benefitted from the withdrawal, or that the money was paid as a loan repayment to Katzenberg and not to Madan. (Id. at 4-5). With respect to the claimed withdrawal of $24,000, plaintiff argues that the money was returned to the Plan one month later, and that there was little, if any, loss to the Plan. (Id. at 10). As for the claim that Katzenberg overstated the Plan assets in connection with certain insurance premiums, plaintiff argues that plaintiff was performing a ministerial duty, not a fiduciary task. (Id. at 12-13). Furthermore, plaintiff alleges that defendants have not provided any admissible evidence to support the claim that plaintiff overstated the Plan's assets for the

45

year 1998. (Id. at 8-9).[49] Finally, plaintiff contends that these claims are all futile because they are barred by the statute of limitations. (Id. at 4-13).[50]

As discussed in connection with plaintiff's motion for summary judgment, there are numerous issues of material fact that remain to be resolved, and additional discovery to be performed that might shed light on some of the unresolved questions. At this point, the Court cannot conclude that the claims sought to be added will be futile.

Plaintiff also argues that defendants have acted in bad faith, in that they have now decided to drop five of the six original counterclaims. (Id. at 13). As evidence of defendants' counsel's "history of filing frivolous pleadings" (id. at 14 n.2), plaintiff cites the fact that defendants' counsel was previously sanctioned for his frivolous conduct in other unrelated cases. See, e.g., Prim v. Peatco Ltd. L.P., No. 90 CV 7272, 1995 U.S. Dist. LEXIS 10528, *6-8 (S.D.N.Y

---

[49]Specifically, plaintiff contends that Mr. Gough's Affidavit, which details this allegation, is unsigned and unsworn, and thus has no evidentiary value. (Id. at 8). Additionally, plaintiff argues that defendants did not submit exhibits to the Gough Affidavit in connection with the motion to amend, and that the document attached to the Gough Affidavit for purposes of the summary judgment motion was a statement for 1999, not 1998, and therefore did not support defendants' contention. (Id. at 9-10). As far as the allegations regarding the validity of the Gough Affidavit are concerned, the Court notes that the same Affidavit, notarized and with accompanying exhibits, was submitted to the Court and provided to plaintiff in connection with the summary judgment motion. Therefore, the unsigned nature of the version of the Gough Affidavit that was submitted for purposes of defendants' motion to amend does not negate its evidentiary value. As to defendants' submission of a statement from 1999 in support of their allegation of malfeasance concerning the 1998 report, defendants' counsel addressed this issue during oral argument (see discussion supra at 20), and, given defendants' representations, the Court refuses to deny defendants' motion for leave to amend on grounds of futility.

[50]Although the issue of whether the statute of limitations detailed in Section 1113 applies in the equitable context of a pension offset was raised briefly during the course of oral arguments in connection with defendants' additional allegations of malfeasance (see Tr. at 16-18, 54-57), neither party raised this issue in the papers they submitted to the Court. Moreover, neither party submitted briefing on this subject despite the Court's explicit request that they do so. (Id. at 56-57). Accordingly, the Court has not addressed this argument.

July 27, 1995) (awarding sanctions where counsel filed "an amended complaint . . . after it had become clear that the claims had no factual or legal basis"); Crigler v. Pennzoil Co., 687 F. Supp. 120, 125 (S.D.N.Y 1988) (awarding legal fees to defendant on a case where Mr. Sandler was an attorney of record for the plaintiff, noting that "[a]lthough the Appeals Court for this circuit has often counseled against chilling creativity in the fashioning of complaints, there comes a point where fertile imaginations produce legal absurdities"). Plaintiff argues that defendants' counsel's pattern of frivolous filings has continued in this case, as demonstrated by the fact that counsel added a number of claims in defendants' first amended answer that defendants now seek to withdraw.[51] (Pl.'s Mem. in Opp. at 16). "It is clearly bad faith, if not remarkable, that such counterclaims pop up, like a jack-in-the-box, in an amended pleading, only to disappear in the next amended pleading. (Id.)

At this point, given that a number of the claims that defendants now seek to withdraw are being pursued in other fora,[52] the Court does not find sufficient evidence of bad faith to deny the motion to amend. Moreover, although there has been some delay while defendants conducted

---

[51]The original counterclaims included a claim by Lazzari for money that he put into the Plan as a result of the underfunding occasioned by plaintiff's alleged malfeasance. Defendants now seek to withdraw this claim, possibly because, as plaintiff contends, Lazzari admitted in his Response to Interrogatory No. 25 that he made no direct contributions to the Plan. (Id. at 14). Defendants also seek to withdraw the third counterclaim relating to an alleged forged lease that is the subject of litigation in another court, the fourth counterclaim relating to a shareholder agreement between plaintiff and Madan, the fifth counterclaim seeking damages under the securities laws, and the sixth counterclaim relating to a consulting agreement that is the subject of yet a third action in Nassau County Supreme Court. (Id. at 15).

[52]Although plaintiff alleges that the claims being pursued in other fora do not involve him personally, but rather involve his relatives or entities with which he is affiliated (Pl.'s Mem. in Opp. at 16), the Court does not find that this allegation, even if true (see Defs.' Reply Mem. at 13), merits a finding of bad faith.

47

their investigation, the Court finds, based on Mr. Gough's Affidavit, that the delay was due in part to defendants' recent discovery of these issues and defendants' desire to conduct a thorough investigation. Accordingly, the Court respectfully recommends that the motion to amend be granted.

## CONCLUSION

Accordingly, it is respectfully recommended that: 1) plaintiff's motion for summary judgment on his first cause of action be denied; 2) the court strike defendants' waiver defense to plaintiff's claim for pension benefits; 3) plaintiff's motion for summary judgment on his second cause of action be denied; 4) plaintiff's motion for summary judgment on his third cause of action be denied, without prejudice subject to renewal following the Court's final disposition of the case; 5) plaintiff's motion for summary judgment on defendants' second counterclaim be denied; and 6) defendants' motion to amend be granted.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Secretary of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED**.

Dated: Brooklyn, New York
      March 12, 2007

_____
Cheryl L. Pollak
United States Magistrate Judge